NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0390n.06

No. 21-3798

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 30, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| BLUE WATER IMPORTERS, INC., | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| THOMAS J. STICKRATH, Director of the Ohio Department of Public Safety; CHARLES L. NORMAN, Registrar of the Ohio Bureau of Motor Vehicles, | ) | |
| Defendants-Appellees. | ) | OPINION |

Before: BOGGS, LARSEN, and DAVIS, Circuit Judges.

BOGGS, Circuit Judge. In 2015, the state of Ohio saw a dramatic increase in imports of cars from Canada—including by appellant Blue Water Importers. The clerks of the Ohio courts of common pleas, who issue vehicle titles to owners, requested guidance from the Ohio Bureau of Motor Vehicles (BMV) on how to comply with state and federal laws. The BMV correctly outlined the procedures for importers to apply for federal certification from the Department of Transportation and pay a bond while certification is pending. But the BMV was mistaken in telling the clerks that, in order to obtain title, importers were required to furnish an original bond-release letter from the National Highway Traffic Safety Administration (NHTSA). In actuality, federal regulations do not require that letter in order to title an imported vehicle *if* NHTSA fails to reach a decision within thirty days of an application for certification—and letters are rarely issued within that timeframe. The BMV's requirement remained in place for a year, with clerks of court informing importers during that time that the bond-release letters were a titling requirement.

Blue Water then sued a group of Ohio officials under 42 U.S.C. § 1983, claiming that the BMV had violated the Commerce Clause and requesting declaratory and injunctive relief. Perhaps realizing that its titling rules exceeded federal requirements, the BMV rescinded the bond-release-letter requirement less than two months after the lawsuit was filed. Four years later, at summary judgment (and with the requirement still rescinded), the district court dismissed the claim as moot. Blue Water now appeals that decision, and we affirm.

## BACKGROUND

Federal law governs the importation of motor vehicles from foreign countries. If, in the judgment of the Secretary of Transportation, a foreign-manufactured vehicle that is not in compliance with domestic safety standards can be brought into compliance, then the vehicle may be imported. 49 U.S.C. § 30141(a)(1). Congress has delegated to the Secretary the authority to enact regulations ensuring that vehicles meet this standard, 49 U.S.C. § 30141(b)(1), and the Secretary, through NHTSA, has done so, 49 C.F.R. §§ 592.1–.9. The relevant NHTSA regulations impose a host of requirements for importers to obtain certification of compliance, including that importers "furnish . . . a bond in an amount equal to 150 percent of the dutiable value of the vehicle" while they conform the imported vehicle to NHTSA's standards. 49 C.F.R. § 592.6(a).

Until the bond is released, a vehicle ordinarily cannot be titled or sold. 49 C.F.R. § 592.6(e)(2), (e)(4). To remove these restrictions, an importer submits an application for certification of compliance with domestic safety standards to NHTSA and, if NHTSA believes further inspection or verification is required, it must provide notice to the importer within thirty days. 49 C.F.R. §§ 592.6(d), 592.8(b)–(d). The "bond . . . shall not be released unless [NHTSA] is satisfied with the certification," but—importantly—if NHTSA takes no action within the thirty days, the bond's restrictions no longer apply, and the vehicle may be "titled, licensed, or registered

for use on the public roads" and sold. 49 C.F.R. § 592.8(d)–(e). If certification is eventually accepted, NHTSA must provide a bond-release letter (and release the bond). 49 C.F.R. § 592.8(f). Crucially, then, nothing in the regulations requires an importer to be in possession of a bond-release letter before it may title and sell a vehicle, provided thirty days have passed since the certification application was submitted to NHTSA.

Titling itself—which indicates legal ownership of a vehicle—is governed by each state's motor-vehicle agency. *E.g.*, Ohio Rev. Code § 4505.03 ("No person . . . shall sell or otherwise dispose of a motor vehicle without delivering . . . a certificate of title . . . ."). In Ohio, the BMV is responsible for regulating the titling system, though state law provides that the clerks of the various courts of common pleas are the ones who process applications and issue certificates of title. Ohio Rev. Code §§ 4505.02, .06(A)(1). The BMV distributes information ("title broadcasts," in BMV nomenclature) providing the clerks with guidance on handling applications, including what documents are required.

In May 2015, in response to an increase in the importation of motor vehicles from Canada into Ohio, the BMV issued guidance on Canadian vehicles for the first time since 2002. The document listed the required elements of a titling application, but did not mention bond-release letters. Five months later, in October 2015, the BMV issued the relevant guidance in this case, Title Broadcast 15-1016, which required that applications for title in Ohio for presumptively importable Canadian vehicles provide "an <u>Original Bond Release Letter</u> from [NHTSA] to verify that Federal Motor Vehicle Safety Standards have been, or will be, met." Ohio Dep't Pub. Safety, Bureau of Motor Vehicles, *Title Broadcast 15-1016: Vehicles Imported from Canada and Other Foreign Countries* 1 (Oct. 16, 2015) (emphasis in original). According to the administrator of the BMV's Office of Vehicle Services, the impetus for this change was a confusion on the part of the

clerks of the courts of common pleas, who required "additional guidance" on "what else is needed" in applications for titling pre-owned Canadian vehicles.[1]

However, under its interpretation of the federal requirements for importing foreign vehicles, the BMV imposed a bond-release-letter requirement. As noted above, under the relevant regulations NHTSA may not always issue bond-release letters and, in many cases, does not do so before a vehicle is eligible to be "titled, licensed, or registered for use on the public roads." 49 C.F.R. § 592.8(e). Instead, the bond's titling and sale restrictions are automatically lifted after thirty days have elapsed, absent affirmative notice by NHTSA. So importers often do not possess a bond-release letter even when they have met the federal importation requirements. Nevertheless, Title Broadcast 15-1016 remained in effect for a year until Blue Water, a Michigan importer of Canadian vehicles frustrated with Ohio's regulations, filed suit.

Blue Water and two Canadian dealers sued (1) the Director of the Ohio Department of Public Safety, (2) the Registrar of the BMV, and (3) various clerks of the courts of common pleas in federal district court. They alleged violations of 42 U.S.C. § 1983, claiming that the BMV's policy of requiring bond-release letters, as well as an additional policy mandating that imported vehicles be inspected in Ohio rather than other states, violated the Commerce Clause.[2] The Canadian dealers were dismissed as parties during the pendency of litigation, as were the clerks of court. In December 2016, roughly two months after Blue Water filed suit, the BMV issued a superseding title broadcast rescinding the bond-release-letter requirement and acknowledging the thirty-day exception in the text of 49 C.F.R. § 592.8(e). The rescission has remained in place.

---

[1] The requirement at issue in this case applies only to so-called "Box 3" vehicles, referring to the section of the form that is checked when importing pre-owned vehicles from Canada.

[2] The requirement that out-of-state vehicles be inspected in-state is not at issue in this appeal.

On cross-motions for summary judgment four years later, the BMV argued that its rescission of the bond-release-letter requirement rendered Blue Water's claim on this issue moot, and that both of Blue Water's Commerce Clause claims failed on the merits. The district court agreed, dismissing the bond-release-letter claim as moot and granting summary judgment to the BMV on Blue Water's in-state-titling claim. Blue Water does not appeal the latter decision, and the BMV does not challenge the partial dismissal for mootness of its own summary-judgment motion. The only question on appeal, therefore, is whether Blue Water's bond-release-letter challenge is moot. We hold that it is and affirm the judgment of the district court.

## ANALYSIS

Jurisdiction does not lie for the federal courts to decide a case "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome"—the doctrine of mootness. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). A moot matter, after all, is "no longer a 'Case' or 'Controversy' for purposes of Article III." *Ibid.* Mootness may rear its head "when a case at first presents a question concretely affecting the rights of the parties, but—as a result of events during the pendency of the litigation—the court's decision would lack any practical effect." *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022) (en banc) (quoting *Ohio v. EPA*, 969 F.3d 306, 308 (6th Cir. 2020)). In this case, the BMV rescinded the challenged policy two months after the start of litigation, and the district court held that this rendered Blue Water's claim moot. We review determinations of mootness de novo. *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022).

Blue Water challenges the district court's holding of mootness on only one ground: that a defendant's "voluntary cessation" of a policy does not moot a case unless "there clearly is 'no

reasonable expectation that the alleged violation will recur.'" *Resurrection Sch.*, 35 F.4th at 528 (quoting *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019)). Although government action is "treated with more solicitude by the courts than similar action by private parties," it is *legislative* cessation that receives the most deference of all, whereas if "a change is merely regulatory, the degree of solicitude the voluntary cessation enjoys is based on whether the regulatory processes leading to the change involved legislative-like procedures." *Speech First*, 939 F.3d at 767–68. Quasi-legislative actions merit deference, but if the regulatory change was "ad hoc, discretionary, [or] easily reversible," especially "[i]f the discretion to effect the change lies with one agency or individual," then "significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim." *Id.* at 768.

As this court recently noted en banc, voluntary cessation of the discretionary regulatory variety is more likely to moot a case when (1) the cessation is remote in time from the filing of the lawsuit, (2) the government entity provided alternative justifications for its changed conduct, (3) the state official or officials responsible for the policy are politically accountable, (4) "relevant circumstances have changed dramatically," and (5) reimposition of a similar policy in the future "likely would not present substantially the same legal controversy." *Resurrection Sch.*, 35 F.4th at 529. Wrapped up together, these considerations determine "whether there is a fair prospect that the challenged conduct will recur in the foreseeable future." *Id.* at 530 (cleaned up).

Here, authority to change the challenged policy lies solely with the Registrar of the BMV, who is empowered by statute to promulgate rules for titling motor vehicles. Ohio Rev. Code § 4505.02. ("The Registrar of the BMV has the exclusive authority to approve Broadcasts to Ohio Clerks of Court. These Broadcasts set forth the BMV's policies and procedures regarding the titling of vehicles in Ohio."). The Registrar is appointed by the Ohio Director of Public Safety,

who is in turn appointed by the Governor. Ohio Rev. Code § 4501.02(A). There is therefore considerable discretion, and only some (indirect) political accountability, in the BMV's issuing new guidance. This is reinforced by the form of the guidance: a one- or two-page broadcast free from citations and capable of being superseded in a matter of days. The challenged title broadcast is therefore the kind of discretionary regulatory policy that is entitled to the lowest level of outright deference when it comes to voluntary cessation.

Turning to the considerations articulated in *Resurrection School*, however, several weigh in the BMV's favor. The circumstances under which Title Broadcast 15-1016 was promulgated are especially relevant. Ohio was seeing a sudden surge in importation of Canadian vehicles, and the BMV had rushed to issue guidance to the clerks of court in May 2015. But clerks over the succeeding months indicated that they still did not understand exactly what was required for titling and needed "additional guidance." So, in October 2015, after a brief (but apparently insufficient) review of the relevant NHTSA regulations, the Registrar promulgated Title Broadcast 15-1016. Later, in March 2016, a conversation between BMV and NHTSA officials about the bond-release-letter requirement revealed that the letter was not and never had been required in all cases in order to obtain title—instead, the regulations contain a significant potential exception. Separately, as a BMV official testified, the Bureau was informed in May 2016 that the volume of certification applications submitted to NHTSA made it impossible for the federal agency to issue letters within thirty days. By all indications in the record, then, a period of confusion following an increase in imported Canadian vehicles into Ohio led the BMV to issue hasty guidance, but it later determined through multiple channels that the guidance should have been significantly revised.

Perhaps the BMV's failure to understand the thirty-day exception written into 49 C.F.R. § 592.8(e) should not have required an extensive dialogue with NHTSA; perhaps it should have

been obvious that the requirements listed in the title broadcast were inconsistent with federal regulations. But the fact that the BMV appears to have received guidance from NHTSA and corrected its policy accordingly indicates that it is unlikely to make the same mistake twice.[3] And it reveals alternative justifications (apart from avoiding adjudication of the merits of the case) for the BMV to have rescinded the challenged title broadcast. Finally, the nationwide increase in certification applications to NHTSA reveals the kind of change in relevant circumstances that would justify a change in BMV policy.

To be sure, not all of the considerations articulated in *Resurrection School* lean in the BMV's favor. Unlike the eight months that elapsed in that case between the filing of the lawsuit and the agency's rescinding its policy, here, the BMV retracted the bond-release-letter requirement a mere fifty-six days after it was sued. And as discussed, the Registrar of the BMV is vested with considerable discretion to rescind or reinstate titling policies. But ultimately, *Resurrection School* directs an analysis of "whether there is a fair prospect that the challenged conduct will recur in the foreseeable future," not simply a judgment of how easily the challenged conduct could theoretically be reimposed. *See Resurrection Sch.*, 35 F.4th at 530 (cleaned up). Dealing, as we are, with probabilities, the likelihood that the BMV will choose to again require bond-release letters is lowered substantially by its past and current understanding (based on NHTSA guidance) that those letters are not always a prerequisite to titling. Because Blue Water has failed to show a fair prospect of reimposition of the requirement, its claim is moot.

---

[3] The BMV has disputed this characterization, arguing at times that the bond-release-letter requirement was not in conflict with federal law because the regulations provide only that once NHTSA's requirements are met, a vehicle *may* (but not *must*) be "titled"—and therefore that each state may then impose its own titling requirements, such as the furnishing of a bond-release letter. We do not, however, address that argument here, where the only issue is mootness and the record indicates that it was NHTSA's guidance that caused the BMV to reverse course.

It is true, as Blue Water states, that mootness is a "heavy burden" for a regulatory agency to carry. But in the case at issue here, a regulatory agency felt compelled to take quick action when confronted by substantial confusion on the part of the clerks of court in eighty-eight counties—and it ultimately issued new guidance once corrected in its understanding by the federal agency that issued the relevant rules. Given that, we see no "fair prospect" that the challenged conduct will recur in the foreseeable future, and hold that the district court was correct that Blue Water's challenge is moot. *Resurrection Sch.*, 35 F.4th at 530 (quoting *Ohio*, 969 F.3d at 310).

## CONCLUSION

For the reasons above, the judgment of the district court is **AFFIRMED**.