REVISED May 14, 2025

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 14, 2024

Lyle W. Cayce
Clerk

No. 23-60230

_____

National Center for Public Policy Research; Nathaniel Fischer; Phillip Aronoff,

*Petitioners*,

*versus*

Securities and Exchange Commission,

*Respondent*.

_____

Appeal from the Securities & Exchange Commission
Agency No. 2022-2023 No-Action Responses

_____

Before Jones, Dennis, and Douglas, *Circuit Judges*.

Per Curiam:[*]

The prior panel opinion is hereby withdrawn, and this opinion is substituted therefor.

For the reasons below, we GRANT the Security and Exchange Commission's (Commission) motion to dismiss for want of jurisdiction. This appeal is accordingly DISMISSED as moot. On that basis, we need not consider the merits of the parties' arguments.

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

I

The Commission oversees security trading and aims to protect shareholders in the risk-based security market. *See* 15 U.S.C. §§ 78b, 78d. To that end, the Commission enforces regulations ensuring that shareholders are informed about the inner workings of publicly traded companies. For example, the Commission promulgates rules governing investors' ability to weigh in on corporate governance through a "proxy" process. *See* 17 C.F.R. § 240.14a-3. This process allows investors to vote for company proposals and other measures at annual shareholder meetings. Before the meetings, companies must circulate proxy materials, which include, among other information, measures to be voted on by shareholders. *Id.* These measures may feature "proxy statements" proposed by individual investors, requesting that the company take some specific corporate action. *Id.* If the statement receives a majority vote from shareholders at the meeting, the company is usually required to take the requested action outlined in the proposal.

Yet a company need not always include its investors' statements in its proxy materials. Indeed, there are thirteen reasons why it may decline to do so. *See id.* §§ 240.14a-8(i)(1)–(13). When exclusion is appropriate, the company must notify the Commission and the proposal's supporter. *Id.* § 240.14a-8(j). This notification procedure "is informational only" and "[n]o response by the Commission or its staff is required." *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 423 n.13 (D.C. Cir. 1992) (alteration in original) (quoting Statement of Informal Procedures for the Rendering of Staff Advice with Respect to Shareholder Proposals, 41 Fed. Reg. 29,989, 29,990 (July 20, 1976) [hereinafter Informal Procedures]). Still, the process aims to bring the matter to the Commission's attention in case "enforcement action may be appropriate" and to "alert the shareholder proponent" so the

shareholder can consider whether to pursue its own remedies against the company. Informal Procedures, 41 Fed. Reg. at 29,990.

Within that framework, the Commission's staff has developed a practice of providing informal advice on whether a particular shareholder proposal is excludable. *Id.*; 17 C.F.R. §§ 202.1(d), 202.2. When a company decides exclusion is called for, it may ask Commission staff for a "no-action letter." Such a letter effectively means that the staff will not recommend an enforcement action if the company follows through with its decision. Yet staff may refuse to issue a letter: it might disagree with the company's decision or even express no position at all. Regardless, a response from the Commission's staff "do[es] not constitute an official expression of the Commission's views." *Id.* § 202.1(d).

## II

This case began with the National Center for Public Policy Research's (Center) desire to include a proxy statement in the Kroger Company's 2023 proxy materials. As a Kroger investor, the Center grew concerned about what it labeled as Kroger's "blatant leftwing actions." To ensure that Kroger did not discriminate against those with conservative viewpoints, the Center requested that the retail company bring the following measure to a shareholder vote:

> Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.

After reviewing the proposal, Kroger initially declined to include it. In doing so, it cited one of the thirteen exceptions, which allows companies to exclude a proposal if it "deals with a matter relating to the company's

ordinary business operations." *Id.* § 240.14a-8(i)(7). Kroger then sent a letter to Commission staff, stating its intention. The Commission staff responded with a no-action letter, agreeing that Kroger had "some basis" for excluding the proposal, as it "relate[d] to, and [did] not transcend, ordinary business matters."

Dissatisfied, the Center asked Commission staff to reconsider its decision and requested review by the SEC Commissioners. Neither attempt was successful. The Center consequently appealed directly to this court, alleging that the Commission engaged in viewpoint discrimination and failed to maintain its neutrality. According to the Center, the Commission made the Center's proposal "less effective by preventing [it] from receiving votes" and "chill[ed] [its] speech by discouraging [it] from making proposals." For that the reason, the Center urges us to "vacate the [Commission's] decision below."

But a few weeks after the Center filed its appeal, it encountered an issue: Kroger filed its 2023 shareholder proxy materials. In them, Kroger included the Center's proposal. And at the shareholder meeting, the measure was brought to a vote. But it failed, garnering less than two percent of the shareholder's support. With that development in mind, the Commission now argues that we need not reach the merits of the Center's arguments because this appeal is moot. The Commission says that Kroger gave the Center the relief it sought because Kroger included the very measure the Center proposed in its 2023 proxy materials. Doing so, the Commission reasons, extinguished any dispute on appeal.

III

Mootness is a jurisdictional limitation rooted in Article III of the Constitution, thus affecting our decision-making power. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of

Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). Though the Center recognizes Kroger's 2023 final proxy materials and corresponding shareholder vote, it nevertheless contends that its challenge remains viable. In so arguing, it cites the "capable-of-repetition-yet-evading-review" exception to the mootness doctrine, a standard used in only the most "exceptional circumstances." *See Empower Texans, Inc. v. Geren*, 977 F.3d 367, 371 (5th Cir. 2020). This exception is narrowly limited to situations where "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Yarls v. Bunton*, 905 F.3d 905, 909 (5th Cir. 2018) (quoting *Turner v. Rogers*, 564 U.S. 431, 440 (2011)).

Though the parties disagree on the first element, we need only consider the second one to resolve this dispute. Therefore, we begin and end by asking whether there is a reasonable expectation that the same parties will be subjected to the "same action" again. *See Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010) (requiring a party to demonstrate "'either a demonstrated probability or a reasonable expectation' that [it] will 'be subject to the same [unlawful governmental] action again'" (alteration in original) (citation omitted) (first quoting *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002); and then quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975))). According to the Center, it intends to keep submitting the same proposal in the future to Kroger. By extension, the Center argues, the Commission will likely continue issuing the same no-action letters, subjecting the Center to the same discrimination it challenges today.

We disagree. The problem with the Commission's argument is that a decision to exclude a proxy statement necessarily depends on the particular

proposal and company at issue. And what happened in 2023 is not certain to happen again. Indeed, the Supreme Court rejected this argument more than five decades ago. In *SEC v. Medical Committee for Human Rights*, 404 U.S. 403 (1972), petitioners challenged a Commission order that refused to force a company to include a Vietnam War-related proposal in its proxy statement. *Id.* at 404. But after petitioners filed suit against the SEC, the company reversed course and included the proposal in its proxy materials the following year. *Id.* at 405–06. When put to a vote, less than three percent of shareholders chose to support the measure. *Id.* at 406. That "meager support" meant that the company could exclude the same proposal for the following three years under SEC regulations. *Id.*; *see also* 17 C.F.R. § 240.14a-8(i)(12) (stating that companies may exclude a resubmitted proposal that received "[l]ess than 5 percent of the votes cast" within the previous three years). Nevertheless, the petitioners argued that the controversy remained live. But the Court concluded that the case was moot. Given "the meager support the proposal attracted," one could "only speculate" that the company would continue including "the proposal when it again becomes eligible for inclusion, rather than to repeat [the] litigation." *Id.*

That same reasoning holds equally to foreclose the Center's arguments here. At least for Kroger, it need not include the Center's proposal for the next three years because it attracted less than five percent of the votes cast. *See* 17 C.F.R. § 240.14a-8(i)(12). So even if the Center again submitted the proposal, and Kroger again chose to exclude it, there would be an independent ground for Kroger's decision to do so. That would make any future action distinct from the one here.

The Center's other argument fares no better. If not Kroger, the Center contends, it will submit the same proposal to other companies, and, naturally, the Commission will again issue the same no-action letter as the one it sent in 2023. But accepting this argument requires that we assume

future companies would choose to exclude the measure,[1] the SEC would issue the same no-action letter in response, and companies would follow through with their decision to exclude the proposal from their proxy materials. That is a chain of assumptions we are neither willing nor able to make. *See Lopez v. City of Houston.*, 617 F.3d 336, 342 (5th Cir. 2010) ("[T]his is an event that 'may not occur as anticipated, or indeed may not occur at all,' which means the claim is merely abstract or hypothetical, and thus too speculative to be fit for judicial review at this time." (citation omitted) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985))); *see also Med. Comm.*, 404 U.S. at 406 (declining to "speculate" regarding future action of the company). Even if theoretically possible, "a mere physical or theoretical possibility" of recurrence is not enough to overcome the general mootness rule. *Murphy v. Hunt*, 455 U.S. 478, 482 (1982).

For its part, the dissent sides with the Center, believing it "at least *reasonable*" to anticipate that third-party companies "will seek to exclude the proposal in the future." Perhaps so. But that alone does not mean this case will recur. A company can exclude a shareholder-backed proposal for a range of reasons, including, for example, a missed submission deadline. *See* 17 C.F.R. § 240.14a-8. Surely, such a decision grounded in this or some other procedural basis would not serve to replicate the same case or controversy. And what of the 2023 shareholder vote at Kroger? Considering "the meager support the proposal attracted," who is to say other third-party companies

---

[1] We must do so mindful that many companies have since opted to include the Center's measure without SEC intervention. *See* EDGAR, https://www.sec.gov/edgar/search/#/q=viewpoint%2520ideology%2520%2522written%2520equal%2520employment%2520opportunity%2522&category=form-cat8 (listing several companies that have included the measure at issue in their proxy materials) (last visited March 19, 2025).

will not choose to *include* the Center's measure to avoid future litigation? *See Med. Comm.*, 404 U.S. at 406. These unanswered questions highlight the difficulty in accepting the Center's reasoning. Indeed, nowhere does the Center explain why any one company is likely to take the same actions as Kroger or would necessarily rely on the same exclusion. And disguising theoretical possibilities as empty assurances makes them no more likely to occur. *See Murphy*, 455 U.S. at 482.

At bottom, Kroger's 2023 shareholder voting is over. The Center "accomplished the purpose for which it sought ancillary assistance from the SEC." *See Mancusi v. Stubbs*, 408 U.S. 204, 207 n.1 (1972). Kroger presented the Center's proposed measure, and it failed. Because the Center received its desired relief sought on appeal, this case is moot, and we lack jurisdiction to hear the Center's petition. *See Spencer v. Kemna*, 523 U.S. 1, 18 (1998) ("We are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong."). To that end, the Government's motion to dismiss is GRANTED, and this appeal is DISMISSED. All pending motions are DENIED as moot.

No. 23-60230

Edith H. Jones, *Circuit Judge*, dissenting:

The SEC is playing catch-me-if-you-can with legal challenges to its recent penchant for issuing viewpoint-discriminatory no-action letters about controversial shareholder proposals.[1] The agency brazenly admits that, if put to a legal test, its no-action letter here should be vacated as arbitrary and capricious. Sadly, the panel majority lets the SEC's manipulations prevail.

The panel majority accepts the agency's contention that this case is moot. But it is impracticable to fully litigate a challenge to the SEC's no-action policy within the interval between issuance of a no-action letter and a company's distribution of proxy materials. And there is no reason to believe the agency will *not* follow its past practice of issuing no-action letters against the National Center for Public Policy Research's shareholder proposals concerning ideological discrimination in the workplace. In fact, SEC rejected NCPPR's request to issue the *same* viewpoint-diversity proposal in Kroger's *2025* proxy materials! Thus, this case is tailor-made for the mootness exception for cases capable of repetition yet evading review.

Because the case isn't moot, we ought to reach the alternative jurisdictional issue and conclude that no-action letter is a final, reviewable order of the SEC in line with *Clarke v. CFTC*, 74 F.4th 627 (5th Cir. 2023). *Clarke* held that a CFTC no-action letter was a judicially reviewable final agency action under the APA.

Ultimately, this court should exercise jurisdiction and vacate the SEC's no-action letter as arbitrary and capricious under the APA, because the agency engages in rank viewpoint discrimination. I respectfully dissent.

_____

[1] SEC displays a pattern of insulating unlawful actions behind claims of non-reviewability. *See, e.g.*, *SEC v. Novinger*, 40 F.4th 297 (5th Cir. 2022).

No. 23-60230

## I.

Before annual shareholder meetings, public companies circulate proxy statements to their shareholders. These statements "include information on items or initiatives on which the shareholders are asked to vote." *Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 328 (3d Cir. 2015) (citation omitted). Shareholders may return ballots to the company or authorize the company to vote their shares in accordance with recommendations of the board of directors.

Proxy statements are subject to regulations promulgated under Section 14(a) of the Securities Exchange Act. The regulation at issue in this case, Rule 14a-8, requires companies to include any eligible shareholder proposal in the company's own proxy materials, unless one of thirteen bases for exclusion applies. 17 C.F.R. § 240.14a-8.

Companies that wish to exclude a proposal on one of the bases listed in Rule 14a-8 must submit a statement of reasons for doing so to SEC staff before distributing proxy materials. *Id.* § 240.14a-8(j). In submitting this statement, companies typically also ask SEC staff "for a no-action letter to support the exclusion of a proposal." *Trinity Wall St.*, 792 F.3d at 336.

A company is not required to include a shareholder's proposal in its own proxy materials "[i]f the proposal deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). For decades, the SEC would apply the ordinary business exclusion to block proposals concerning social issues. That changed in 1998, when the SEC announced that proposals that "focus[] on s*ufficiently significant social policy issues* (e.g., significant discrimination matters) generally would *not* be considered to be excludable, because the proposals would transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote." SEC Release No. 34-40018, 1998 WL

254809, at *4 (May 21, 1998) (emphasis added).  The SEC thus created the "social policy exception" to the ordinary business exclusion.

In December 2022, NCPPR, a longtime shareholder of Kroger, requested that the following proposal be included in Kroger's 2023 proxy materials:

> Shareholders request the Kroger Company ("Kroger") issue a public report detailing the potential risks associated with omitting "viewpoint" and "ideology" from its written equal employment opportunity (EEO) policy. The report should be available within a reasonable timeframe, prepared at a reasonable expense and omit proprietary information.[2]

The proposal was modeled on an earlier proposal that the SEC determined was not excludable under the ordinary business exclusion.  The earlier proposal requested that CorVel Corporation "issue a public report detailing the potential risks associated with omitting 'sexual orientation' and 'gender identity' from its written equal employment opportunity policy."  CorVel Corp., SEC No-Action Letter, 2019 WL 1640021, at *1 (June 5, 2019).

In February 2023, Kroger sent SEC staff a letter stating its intention to exclude NCPPR's proposal under the ordinary business exclusion and seeking a no-action letter.  NCPPR sent response letters in which it invoked the social policy exception and argued that the SEC would be engaging in viewpoint discrimination if it issued no-action relief, because the agency had

---

[2] As explained below, the same proposal was contemporaneously submitted to BlackRock, Walgreens, American Express, Apple, Alphabet, and Redfin. And NCPPR asserts it will continue to submit the same proposal to other companies in which it holds shares.  Since 2019, the SEC has granted no-action relief to the following companies regarding the same proposal:  BlackRock, Inc., Walgreens Boots All., Inc., Salesforce.com, Inc., Alphabet, Inc., Apple Inc.

No. 23-60230

previously denied such relief with respect to "substantially identical" proposals that adhered to a different political viewpoint.

Without explaining its reasoning, SEC staff sent Kroger a no-action letter in April 2023, stating in part: "There appears to be some basis for your view that the Company may exclude the Proposal under Rule 14a-8(i)(7). In our view, the Proposal relates to, and does not transcend, ordinary business matters."

After the Commission declined to review the SEC staff decision, NCPPR filed this petition for review. While this appeal has been pending SEC rejected yet again an identical viewpoint discrimination proposal submitted by NCPPR for inclusion in Kroger's proxy materials. Commission approval was denied yet again.[3]

## II.

The controversy over the specific no-action letter concerning Kroger's 2023 proxy materials is moot because the 2023 proxy season closed over a year ago. Further, SEC staff issued another no-action letter in 2024 and again in 2025, albeit on different grounds, with respect to the proposal that NCPPR resubmitted to Kroger.[4] Notwithstanding mootness as to the 2023 issue, the controversy represented by this case is not only capable of repetition yet evading review, but has evaded review more than once, and we should resolve it on the merits.

---

[3] True, Kroger sought exclusion on an alternate basis, but the same scenario has been repeated multiple times regarding multiple public companies.

[4] *See* 17 C.F.R. § 240.14a-8(i)(12) (providing that a company may exclude a resubmitted proposal that, within the previous three years, received "[l]ess than 5 percent of the votes cast").

"A case becomes moot . . . when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015) (quotation marks and citation omitted). According to the Supreme Court, the exception to mootness for cases that are "capable of repetition yet evading review" applies when "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Turner v. Rogers*, 564 U.S. 431, 439–40, 131 S. Ct. 2507, 2515 (2011) (citation omitted).

**1.**

The panel focuses on the second prong of mootness analysis, concluding mistakenly that there is no reasonable expectation that NCPPR will be subjected to the same action by SEC staff in the future. When predicting future action by an entity, observing how the same entity has acted in the past is usually informative. The SEC previously issued five no-action letters to every company (BlackRock, Walgreens, Salesforce, Apple, Alphabet) that requested one concerning the same proposal that NCPPR submitted to Kroger in 2023. NCPPR attests that it has submitted or will submit the same proposal to these and other companies in the future. And as noted above, NCPPR proposed and was rejected again as to an identical proposal to be included in Kroger's 2025 proxy materials. It is *wholly unreasonable* to expect both that these companies will *not* seek to exclude the proposals in the future, as they have in the past, and that SEC staff will *not* continue issuing no-action letters when requested.

The reasonableness of this prediction of future conduct is bolstered by a 2021 announcement that SEC staff "is no longer taking a company-specific approach to evaluating the significance of a policy issue under Rule 14a-

8(i)(7)." SEC Staff Legal Bulletin No. 14L (Nov. 3, 2021). In other words, regardless of the company requesting no-action relief, staff will reach the *same* conclusion: the subject of NCPPR's proposal is not a "significant social issue" that transcends ordinary business matters, and any proposal on the subject can be excluded under Rule 14a-8(i)(7).

The panel opinion contends that *SEC v. Medical Committee for Human Rights*, 404 U.S. 403, 92 S. Ct. 577 (1972), supports dismissal for mootness. I disagree. There, the Court determined that the case was mooted on appeal by Dow Chemical's inclusion of the Medical Committee's shareholder proposal in its proxy materials, and that Dow's allegedly wrongful exclusion of the proposal was not reasonably likely to recur. *Id.* at 405–06, 92 S. Ct. at 579. The Court found unpersuasive the Committee's contention that "it is likely that Dow will reject inclusion in the future as it has in the past." *Id.* at 406, 92 S. Ct. at 579. It explained, "[w]hether or not the Committee will actually resubmit its proposal or a similar one in 1974 is purely a matter of conjecture at this point, as is whether or not Dow will accept it." *Id.* In this case, however, whether NCPPR will resubmit its proposal is not conjectural; it already has done so—and not only to Kroger, but to *other companies* as well. It is more than likely, not just reasonable to expect that some company will again seek to by no-action letter to exclude the proposal under the ordinary business exclusion, and SEC staff will authorize them to do so.

The panel opinion is simply wrong to find a mere "theoretical possibility" that SEC staff will issue no-action letters against NCPPR's proposals in the future. The reasonable expectation prong is satisfied here.

**2.**

The panel opinion does not address the first mootness prong (on duration), but the answer is obvious. Paradigmatically, SEC staff issued its no-action letter on April 12, 2023, and Kroger distributed its materials thirty

days later—on May 12, 2023. The SEC is correct that this court has recognized that there is no "calendar for evading review," and "[c]laims need to be judged on how quickly relief can be achieved in relation to the specific claim." *Empower Texans, Inc. v. Geren*, 977 F.3d 367, 370 (5th Cir. 2020). But "[c]omplete judicial review" is extraordinarily unlikely in a timeframe as short as thirty days. *See id.* ("The Supreme Court has stated that a case evades review if its duration is too short to receive '*complete* judicial review,' apparently meaning review in that Court.'" (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 774, 98 S. Ct. 1407, 1414 (1978))).

The SEC invokes this court's decision in *Empower Texans* to argue that, because "expedited procedures" were "available" to NCPPR, this case was not too short in duration to be fully litigated before being rendered moot by Kroger's distribution of proxy materials. *Id.* at 371. But the availability of expedited procedures was significant in *Empower Texans* only because the appellant "did not take advantage of" the rules permitting it to seek expedited review. *Id.* at 372. NCPPR attempted to take advantage of those rules here by seeking expedited briefing; the motions panel simply denied relief.

This important dispute, going to the heart of agency evenhandedness, is plainly capable of repetition yet evading review. The exception to mootness should have been applied.

## III.

The SEC raises two other threshold issues apart from mootness. The SEC argues that the no-action letter is not a reviewable "final order" under the APA, and alternatively, it asserts that no-action letters, being inherently discretionary, are not judicially reviewable at all. Although the panel does not reach these issues, both contentions are meritless.

**1.**

Under 15 U.S.C. § 78y(a)(1), "A person aggrieved by a final order of the [SEC] . . . may obtain review of the order in the United States Court of Appeals for the circuit in which he resides or has a principal place of business . . . ." The SEC contends that the no-action letter issued by SEC staff is neither "final" nor an "order."

This court's recent decision in *Clarke v. CFTC* holds otherwise in a strikingly similar situation. 74 F.4th 627 (5th Cir. 2023). In *Clarke*, a division of the CFTC issued a letter in 2022 rescinding a no-action letter the division had issued many years earlier. This court held that the 2022 letter was a "final agency action" under the APA and therefore reviewable. *Id.* at 636–39. The 2022 letter was an "agency action" because the first no-action letter amounted to a "grant[] of permission to avoid compliance with administrative requirements" and, thus, was a "license" within the meaning of the APA. *Id.* at 637; *see* 5 U.S.C. § 551(8), (13). The letter was "final" because it satisfied the two-pronged standard for finality: It consummated the CFTC's decisionmaking process because the "decision to issue or withdraw the letter [wa]s unappealable" within the agency. *Clarke*, 74 F.4th at 638. And it carried legal consequences because regulations provided that a recipient of a no-action letter "may rely" on it, which effectively "withdrew some of the CFTC's discretion." *Id.* (quoting 17 C.F.R. § 140.99(a)(2)).

There is no basis for distinguishing *Clarke*. First, the SEC's no-action letter, like the CFTC's underlying letter in *Clarke*, operated similarly to a license by effectively authorizing Kroger to exclude NCPPR's proposal. Whether technically a license or some other agency action, it is an "order" under the APA. *See* 5 U.S.C. § 551(6) (defining "order" to include "a final disposition . . . of an agency in a matter other than rule making but including

licensing"). Second, the no-action letter was final because it was not subject to further agency review and carried legal consequences. The full Commission refused NCPPR's request for review of the staff decision, meaning it was not subject to further review, and the letter carried legal consequences because it "withdrew some of the [SEC's] discretion" to "bring enforcement proceedings against the holder of [the] no-action letter." *See Clarke*, 74 F.4th at 638 & n.6. The SEC staff's no action letter stated that staff would not recommend enforcement action if Kroger excluded NCPPR's proposal. Such a recommendation in this and other no-action letters operates, in practice, "as a norm or safe harbor by which" recipient companies "shape their actions." *See Texas v. EEOC*, 933 F.3d 433, 444 (5th Cir. 2019) (citation omitted). SEC points to no instances where the Commission has overridden no-action letters to institute enforcement actions. And SEC no-action letters have additional legal weight because they serve as precedent for future no-action decisions. *See* 17 C.F.R. § 240.14a-8(j)(2)(ii) (indicating that companies must "refer to the most recent applicable authority, such as prior Division letters issued under [Rule 14a-8]" when seeking to exclude a shareholder proposal); *see also* 17 C.F.R. § 202.1(d) (no-action letters "can be relied upon as representing the views of that division").

Obviously, Kroger believed that SEC's previous no-action letter carried legal consequences. Kroger's recent renewed request for a no-action letter concerning NCPPR's proposal for Kroger's 2025 proxy materials cited SEC's previous decision. Kroger justified its request "by invoking the SEC's 'previous concurrence with Kroger's views that the Company may omit the 2023 Proposal pursuant to Rule 14a-8(i)(7).'" *See* 5th Cir. Loc. Rule 28j Letter submitted by NCPPR (Feb. 25, 2025).

*Clarke*'s logic emanated directly from this court's recent decision in which an "advisory opinion" by the Department of Labor, a formally non-

binding statement applying the Employee Retirement Income Security Act to a specific situation, was held to be reviewable final agency action. *Data Mktg. P'ship, LP v. Dep't of Labor*, 45 F.4th 846 (5th Cir. 2022). *Data Marketing,* in turn, relied on the Supreme Court's most recent explanation that for appellate review purposes, the finality of agency action, including its legal effect, "is generally a 'pragmatic' inquiry." *Id.* at 854-55 (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599, 136 S. Ct. 1807, 1815 (2016)). As in *Clarke*, the advisory opinion in *Data Marketing* satisfied the first finality prong because it was "not subject to further Agency review." 45 F.4th at 853 (quoting *Sackett v. EPA*, 566 U.S. 120, 127, 132 S. Ct. 1367, 1369 (2012)). The advisory opinion satisfied the second prong because it provided requesters the right to rely in certain circumstances on the opinion and is "binding as a practical matter." *Id.* at 854 (citing *Texas*, 933 F.3d at 442). Together, these cases demonstrate that the SEC's no-action letter to NCPPR is a final, appealable agency action.

To the extent the law of other circuits differs, the law of this circuit controls our court. *Compare Data Mktg.*, 45 F.4th at 855 (agency advisory opinion is "binding as a practical matter"), *and Texas*, 933 F.3d at 442 (agency guidance document was final agency action), *with Amalgamated Clothing & Textile Workers Union v. SEC*, 15 F.3d 254, 257 (2d Cir. 1994) (no-action letter is not formally binding). It is true that *Amalgamated Clothing* and other cases have held SEC no action letters to be neither "agency action" nor "final" for purposes of appeal. *See N.Y.C. Emp's Ret. Sys. v. SEC*, 45 F.3d 7, 12 (2d Cir. 1995)(defining no-action letters as "interpretive rules"); *Roosevelt v. E.I. DuPont de Nemours & Co.*, 958 F.2d 416, 427 (D.C. Cir. 1992)(no-action letter is neither "an agency adjudication or rulemaking"); *Kixmiller v. SEC*, 492 F.2d 641, 644 (D.C. Cir. 1974)(no-action letter issued by SEC staff rather than the Commission and without formal Commission sanction is unreviewable); *Bd. of Trade of City of Chi. v. SEC*, 883 F.2d 525,

529 (7th Cir. 1989)(no-action letter is tentative and thus not final because the SEC can change its position).  But notably, all of these decisions long predate the Supreme Court's recent decisions, characterized by *Hawkes* and *Sackett*, *supra*, which have espoused pragmatic tests of final agency action.  The Court's decisions have thus broadened judicial review where administrative agencies' actions, despite disclaimers, actually do guide private entities' behavior.  As in *Clarke* and *Data Marketing*, it cannot be doubted that parties regulated by the SEC, and their lawyers, devote much time and effort to securing and relying on staff no action letters, while parties like NCPPR have no practical remedy, apart from judicial review, against unfavorable "informal" agency actions.

The whole point of the CFTC's letter in *Clarke*, just like the "whole point" of Kroger's seeking an SEC no-action letter, was to get a "green light" to exclude NCPPR's proposal.  *Id.* at 637.  That recipients of no-action letters may rely on them is also evident not only from the regulation that gives them precedential weight, 17 C.F.R. § 240.14a-8(j)(2)(ii), but also from the practice of the SEC over the years.  As NCPPR notes in reply, "Out of the thousands of [no-action] decisions issued by the Division over the decades, the SEC claims only four or five times the Commission ever voiced the slightest disagreement."

Were the SEC to prevail here, a CFTC no-action letter would be reviewable in this circuit but an SEC no-action letter would not.  The distinct treatment of the two letters from agencies with comparable statutory missions is unjustifiable in its own right.  Even worse, the disparity would yield uncertainty for litigants and potential litigants, especially those adversely affected by no-action letters from agencies other than the CFTC and SEC. Under a sensible and logical approach, this circuit's treatment of no-action letters' reviewability should be uniform.

This court should adhere to *Clarke* and hold that the SEC's no-action letter is a final, reviewable order.

**2.**

*Clarke* likewise resolves the SEC's contention that its decision to issue a no-action letter is "committed to agency discretion by law" and therefore beyond APA judicial review. *See Heckler v. Chaney*, 470 U.S. 821 (1985); 5 U.S.C. § 701(a)(2). *Clarke* rejected a nearly identical argument. *See* 74 F.4th at 639 ("This case does not challenge an agency's discretionary decision to enforce (or not enforce) the law. What is challenged, rather, is the withdrawal of a regulatory instrument (the no-action letter) that ensured the DMO would not recommend that the agency enforce the CEA against PredictIt").

**IV.**

Because there are no jurisdictional hurdles, this panel should have held that the SEC's no-action letter was arbitrary and capricious, in violation of the APA. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 141 S. Ct. 1150, 1158 (2021). The SEC itself concedes that, were this court to exercise jurisdiction, the no-action letter is arbitrary and capricious because it lacks a reasoned explanation for its conclusion that NCPPR's proposal was excludable under the ordinary-business exclusion. The no-action letter to Kroger should have been vacated and remanded on that basis.

Finally, although it is unnecessary to reach the other arguments that NCPPR and the Intervenor[5] present, it must be noted that NCPPR and its

_____

[5] The Intervenor is the National Association of Manufacturers.

No. 23-60230

Amicus[6] cite compelling evidence that the SEC has routinely applied the ordinary business exclusion in a manner that disfavors conservative-oriented proposals. While proposals that touch on sexual-orientation discrimination have been denied no-action letters and must be voted on by shareholders, that of NCPPR, concerning ideological discrimination, has consistently been disfavored by the agency. The SEC's disfavoring of conservative proposals also extends well beyond the discrimination context to topics like gun regulation, "misinformation," and ESG. To apply a rule selectively, as the SEC appears to have done, is lawless.

The panel opinion errs in refusing to reach the merits in this case. I respectfully dissent.

---

[6] Specifically, the Alliance Defending Freedom.